# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 24, 2009            Decided May 12, 2009

No. 08-1080

MORRIS COMMUNICATIONS, INC.,
APPELLANT

v.

FEDERAL COMMUNICATIONS COMMISSION,
APPELLEE

On Appeal of an Order
of the Federal Communications Commission

*Frederick M. Joyce* argued the cause for the appellant. *Ronald E. Quirk Jr.* entered an appearance.

*Maureen K. Flood*, Counsel, Federal Communications Commission, argued the cause for the appellee. *Matthew B. Berry*, General Counsel, *Jacob M. Lewis*, Associate General Counsel, and *Richard K. Welch*, Acting Deputy Associate General Counsel, Federal Communications Commission were on brief. *Daniel M. Armstrong*, Associate General Counsel, and *Joseph R. Palmore* and *James M. Carr*, Counsel, Federal Communications Commission, entered appearances.

Before: GINSBURG, HENDERSON and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Morris Communications, Inc. (Morris), a family-owned mobile, paging and communications service provider, appeals the Federal Communications Commission (FCC or Commission) order denying its requests to waive the automatic cancellation of its nine specialized mobile radio (SMR) licenses. For the reasons set forth below, we affirm the Commission's order.

**I.**

On April 15, 1996, the FCC notified Morris that it had successfully bid for nine 900 MHz SMR licenses covering certain areas in the southeast United States. *FCC Announces Winning Bidders in the Auction of 1,020 Licenses to Provide 900 MHz SMR in Major Trading Areas*, 11 F.C.C.R. 18,599, 18,611-22 (Apr. 15, 1996). Morris chose to pay its winning bids in quarterly installments, which made the licenses "conditioned upon the full and timely performance of [Morris's] payment obligations under the installment plan." 47 C.F.R. § 1.2110(d)(4) (1994). Indeed, Morris's licenses expressly stated that "authorization is conditioned upon the full and timely payment of all moneys due pursuant to sections 1.2110 and 90.812 of the Commission's rules and the terms of the Commission's installment plan . . . . Failure to comply with this condition will result in the automatic cancellation of this authorization." *E.g. Morris Commc'ns, Inc.*, License KNNY352 at 7 (Oct. 16, 1996).

For five years Morris made the quarterly payments either on time or within the two consecutive 90-day automatic grace

periods authorized by 47 C.F.R. § 1.2110(g).[1] On July 31, 2001, however, Morris failed to make the installment payment on each of its nine licenses. It also failed to make payment plus late fees by the end of the two 90-day grace periods, that is, January 31, 2002. Earlier in January 2002, the FCC began outsourcing its loan servicing to a private vendor, Colson Services Corporation (Colson). Colson had notified Morris by letter in early January that it was taking over the FCC's loan servicing and that Morris was to send all payments to Colson. It enclosed a form that required Morris to designate an employee responsible for bill handling. Morris returned the form, designating its controller as the responsible employee. Colson sent the January 31, 2002

---

[1] 47 C.F.R. § 1.2110(g)(4) (2006) provides:

> Any licensee that fails to submit its quarterly payment on an installment payment obligation . . . may submit such payment [plus a 5% late fee] on or before the last day of the next quarter . . . without being considered delinquent. . . . If any licensee fails to make the Required Installment Payment on or before the last day of the first additional quarter . . . , the licensee may submit its Required Installment Payment on or before the last day of the next quarter [plus a 10% late fee]. . . . If an eligible entity obligated to make installment payments fails to pay the total Required Installment Payment, interest and any late payment fees associated with the Required Installment Payment within two quarters (6 months) of the Required Installment Payment due date, it shall be in default, its license shall automatically cancel, and it will be subject to debt collection procedures.

47 C.F.R. § 1.2110(g)(4)(i)-(iv).

installment payment notices to Morris but without addressing them to the controller and the notices did not reach Morris's controller until February 4, 2002—four days after the payments were due. Morris remitted the full amount owed to the FCC on February 5, 2002.

On April 26, 2002, the FCC notified Morris that "an Event of Default ha[d] occurred," that "the License[s] automatically cancelled by operation of the Rules and [that] the Commission [wa]s commencing debt collection procedures." Letter from Mark Reger, CFO, FCC, to Morris Communications, Inc. at 1 (Apr. 26, 2002). The letter further noted that "all of [Morris's] obligations . . . ha[d] been accelerated." *Id.* at 2. On May 2, 2002, Morris requested a waiver from the automatic cancellation rule. In its request, Morris explained the circumstances leading up to its late February 5, 2002 installment payments and asked the Commission to review its request "as expeditiously as possible." Letter from Frederick M. Joyce and Marianne Roach Casserly, Attorneys, Alston & Bird LLP, to Mark Reger, CFO, FCC, at 5 (May 2, 2002) (Waiver Request). On May 6, 2002, Morris again wrote to the Commission, "request[ing] that the Commission stay the effectiveness of the decisions set forth in [the Commission's] letters dated April 26, 2002." Letter from Frederick M. Joyce and Marianne Roach Casserly, Attorneys, Alston & Bird LLP, to Mark Reger, CFO, FCC, at 1 (May 6, 2002) (Request for Stay).

The FCC responded on May 9, 2002, acknowledging receipt of the Waiver Request and informing Morris that "[w]ithin 30 days of this letter we will mail you either a resolution to your item or a letter telling you when you can expect a resolution." Letter from Mark A. Reger, CFO, FCC to Frederick M. Joyce and Marianne Roach Casserly, Attorneys, Alston & Bird LLP, at 1 (May 9, 2002). Thirty days came and went, however, and

Morris heard nothing from the Commission. More time elapsed and, even after Morris's repeated telephone calls and written inquiries, the Commission did not respond. Morris continued to make timely payments on its nine licenses until October 29, 2002. At that point, Morris stopped making payments on seven of the nine licenses.

Not having received any reply from the FCC by December 2002, Morris then began construction on the two SMR stations on whose licenses it had continued making payments and notified the FCC of the stations' construction.[2] Letter from Frederick M. Joyce and Ronald E. Quirk, Jr., Attorneys, Alston & Bird LLP, to William Kunze, Chief, Commercial Wireless Division, Wireless Telecommunications Bureau, FCC (Jan. 14, 2003). Morris also submitted—and the FCC processed—two corresponding Notifications of Buildout. *See* 47 C.F.R. § 1.946(d) (buildout notification required within 15 days of end of construction period).

On January 21, 2003, Morris filed another Waiver Request with the FCC. In it, Morris asked the FCC for (1) "a one-year extension of time, up to and including December 31, 2003, to fully construct a digital 900 MHz SMR system in all its authorized [Major Trading Areas]," (2) a "waiver of [section] 1.946(e) of the Commission's rules, which states that requests for extension of time to construct must be filed before the expiration of the construction of coverage period," and (3) a

---

[2] Morris completed construction of the stations by December 31, 2002, because otherwise "its authorization terminate[d] automatically (in whole or in part as set forth in the service rules), without specific Commission action, on the date the construction or coverage period expires." 47 C.F.R. § 1.946(c); *see also id.* § 90.665. December 31, 2002 was the date the construction period ended for the two stations.

one-year forbearance of its installment payment obligations on each of its nine licenses. *Morris Commc'ns, Inc.*, Petition for Rule Waiver at 6 (Jan. 21, 2003). In support of its request, Morris noted "the unique and unusual regulatory uncertainty surrounding [its] licenses" and "the fact that demand for 900 MHz SMR services in the vast majority of these predominantly rural markets simply has not occurred." *Id.* at 7.

On April 25, 2005, after almost three years of nothing but silence from the Commission, the Auctions and Spectrum Access Division (Division) finally denied both of Morris's waiver requests noting that "Morris ha[d] failed to demonstrate that the underlying purpose of the Commission's payment rule would not be served, or would be frustrated, by its application in this particular case." *Ronald E. Quirk, Jr.*, 20 F.C.C.R. 8176, 8179 (Apr. 25, 2005). The Division also noted that "Morris acknowledges that it is facing financial difficulties and that it cannot . . . continue to make its installment payments for these licenses." *Id.* at 8181. Morris thereafter stopped making installment payments on its remaining two licenses.

On May 25, 2005, Morris appealed the Division's decision to the full Commission. In its application for review, Morris argued, *inter alia*, that the Division ignored FCC precedent in denying Morris's waiver requests, was equitably estopped from revoking Morris's licenses, did not provide a reasoned explanation for its action and denied Morris procedural due process. While review was pending, Morris offered to negotiate a settlement agreement with the FCC whereby it could retain its nine licenses, fulfill its payment obligations for each license within one year and continue to make its installment payments for each of the licenses until paid in full. The Commission eventually rejected the offer.

In mid-December 2005 Morris asked the Commission for special temporary authority (STA) to operate its two constructed SMR stations for a period of 180 days or until the FCC issued a decision, whichever occurred first. The Commission granted the STA for both stations on December 28, 2005. On June 8, 2006, Morris requested an extension of the STA for an additional 180-day period, which request the FCC appears to have granted.

On February 21, 2008, almost three years after Morris petitioned for review, the Commission issued its decision denying Morris's application for review. *Morris Commc'ns, Inc.*, 23 F.C.C.R. 3179 (Feb. 21, 2008). The Commission determined that "Morris ha[d] failed to show that, by denying its waiver requests, the Division treated it differently than similarly situated entities" and the "Division's denial was therefore not an abuse of discretion." *Id.* at 3186 ¶ 15. The FCC stated that "the Commission has explained unequivocally that, because parties remain obligated for the full amount of their debt following their default on installment payments, the Commission's acceptance of a payment after such a default does not, by itself, constitute a constructive waiver of the automatic cancellation rule or revive an automatically canceled license." *Id.* at 3187 ¶ 18. Moreover, the Commission noted that "[t]he Division correctly found Morris's assertion that it was uncertain as to the exact amount owed, and that it received its payment notice late, insufficient by itself to justify a waiver of the installment payment rules" because FCC precedent makes clear that it is "the licensee's responsibility to know the amounts and due dates of its installment payments." *Id.* at 3188-89 ¶ 21. Regarding Morris's claim of equitable estoppel, the Commission concluded that it "ha[d] done nothing, by either act or omission, that would have led Morris to believe that the licenses had not automatically cancelled." *Id.* at 3192 ¶ 30. The Commission further determined that the Division acted reasonably in denying

Morris's waiver requests, *id.* at 3193-97, and that Morris had not been deprived of due process, *id.* at 3197-3201. Morris then timely appealed to this Court. *See* 47 U.S.C. § 402(b)(5).

## II.

*A. Abuse of Discretion*

Morris submits that the FCC abused its discretion in failing to grant Morris's two waiver requests because it failed to follow precedent waiving "its automatic cancellation rules in circumstances either identical to or far less compelling than Morris'[s] situation." Br. of Appellant at 10. We will vacate the denial of a waiver "only when 'the agency's reasons are so insubstantial as to render that denial an abuse of discretion.'" *BDPCS, Inc. v. FCC*, 351 F.3d 1177, 1181 (D.C. Cir. 2003) (quoting *Mountain Solutions, Ltd. v. FCC*, 197 F.3d 512, 517 (D.C. Cir. 1999)). Under this standard, the Commission abuses its discretion if it fails to "provide adequate explanation before it treats similarly situated parties differently." *Petroleum Commc'ns, Inc. v. FCC*, 22 F.3d 1164, 1172 (D.C. Cir. 1994). "[H]owever, the agency's strict construction of a general rule in the face of waiver requests is insufficient evidence of an abuse of discretion." *Mountain Solutions, Ltd.*, 197 F.3d at 517.

Under the Commission's regulations, a waiver request *may* be granted if:

> (i) The underlying purpose of the rule(s) would not be served or would be frustrated by application to the instant case, and . . . a grant of the requested waiver would be in the public interest; or,

> (ii) In view of unique or unusual factual circumstances of the instant case, application of the rule(s) would be inequitable, unduly burdensome or contrary to the public interest, or the applicant has no reasonable alternative.

47 C.F.R. § 1.925(b)(3). The FCC may grant a waiver of the automatic cancellation of a license due to a missed payment deadline if the deadline was missed due to "inadvertence or administrative error." *Winstar Broad. Corp.*, 17 F.C.C.R. 6126, 6128 (Mar. 25, 2002); *see Delta Radio, Inc. v. FCC*, 387 F.3d 897, 901 (D.C. Cir. 2004) ("The FCC's policy is to grant waivers only for cases in which administrative error caused the due date to be missed."). To establish inadvertence or administrative error, the licensee must show that it

> demonstrated prior compliance with Commission rules, good faith, or prompt action to rectify the delinquency; there was no record that the payment shortfall was part of a deliberate effort to delay payment; the public interest would not be served by rigid enforcement of the payment deadline; and some flexibility [is] appropriate in addressing a minor delinquency with respect to the payment.

*Winstar*, 17 F.C.C.R. at 6128-29. In *Meredith S. Senter, Jr., Esq.*, 14 F.C.C.R. 5003 (FCC Auctions & Indus. Analysis Div. Feb. 2, 1999), for example, the FCC granted a waiver to a licensee that had made its first installment payment "nearly five months after th[e] payment was due." *Id.* at 5003. The regulations in force at the time "provided that an entity that was more than 90 days delinquent in any installment payment was in

default; however, upon default or in anticipation of default, licensees were permitted to request a grace period of three to six months." *Id.* Even though the licensee did not request a grace period, the Commission granted the waiver, "recogniz[ing] that the acceptance of [the licensee's] late payment could have been construed as a waiver of the payment deadline" and "acknowledg[ing] that [the licensee's] record of timely payments over a period of nearly two years since payment of the second installment [wa]s indicative of a commitment on the [licensee's] part . . . to meet its payment obligations." *Id.* at 5004; *see also Lloyd W. Coward, Esq.*, 14 F.C.C.R. 2173, 2174 (FCC Wireless Telecomm. Bureau Jan. 29, 1999) (waiver granted where licensee missed installment payment deadline and did not request grace period but FCC nevertheless accepted late payment).

In *Lakeland PCS LLC*, 15 F.C.C.R. 23,733 (FCC Commercial Wireless Div. Nov. 27, 2000), the FCC granted a waiver where the licensee missed the installment payment plus both 90-day grace periods, remitting payment one day after the second grace period had ended, but continued to receive payment notices from the FCC after that date and "timely made" payment after receipt of the notices. *Id.* at 23,734. The Commission concluded that "the circumstances presented here are consistent with previous instances, where, as a result of administrative oversight, we have acknowledged that a constructive waiver of the installment payment deadlines has occurred." *Id.* at 23,735.

In *David Irwin*, 19 F.C.C.R. 4011 (FCC Auctions & Indus. Analysis Div. Mar. 3, 2004), the FCC granted a waiver to a licensee that had failed to make a timely quarterly installment payment because the payment it had forwarded via certified mail to the FCC three days before the due date arrived after the due

date. *Id.* at 4011-12. Believing its payment was timely, the licensee failed to pay the late fees for more than two quarters and its two licenses were then automatically cancelled. *Id.* at 4012. In the interim, however, the licensee "requested a statement of all amounts then-outstanding in connection with the installment payment plan for both licenses and paid the full amount, including all amounts assessed as late fees." *Id.* at 4015. The FCC granted the request but noted that "[i]f . . . the facts of this case had provided *any* indication that [the licensee] lacked the financial wherewithal, basic responsibility or willingness to pay the equivalent of the late fees by the January 31, 2001 deadline, then it would appear that a waiver would not be justified." *Id.* (emphasis added).

Relying on this authority, Morris asserts that the Commission abused its discretion in failing to grant Morris a waiver. The Commission distinguished the above-cited precedent, however, and, we conclude, did so reasonably. First, the Commission concluded that *Senter* was distinguishable because, unlike the licensee in *Senter*, Morris was on notice that the Commission's acceptance of its post-default installment payments did not constitute a constructive waiver.[3] Moreover, unlike the *Senter* licensee, Morris stopped making installment payments on seven of its nine licenses less than one year after its

---

[3] This fact also distinguishes this case from *Coward* because there, too, the licensee lacked notice that the FCC's acceptance of a post-default installment payment did not act as constructive waiver. 14 F.C.C.R. at 2173-74. As noted earlier, the Commission has since made clear that "mere acceptance of a payment after cancellation w[ill] not constitute a constructive waiver of the automatic cancellation rule." *Licenses of 21st Century Telesis Joint Venture*, 16 F.C.C.R. 17,257, 17,261 ¶ 12 n.24 (Sept. 21, 2001) (citing *Lakeland*, 15 F.C.C.R. at 23,735 n.11).

default and stated post-default that it was in financial distress.[4] *Morris Commc'ns, Inc.*, 23 F.C.C.R. at 3187-88. The Commission also reasonably distinguished *Lakeland*, noting that there, unlike here, "the Commission had continued to send payment notices to the former licensee despite the automatic cancellation of the license." *Id.* at 3188 (citing *Lakeland*, 15 F.C.C.R. at 23,734-35). In *Lakeland*, the Commission also stated that, without more, "late payment could not revive an automatically cancelled license." 15 F.C.C.R. at 23,735. Although Morris did not bring *Irwin* to the FCC's attention, the FCC's reasoning in distinguishing *Senter* and *Lakeland* applies to distinguish *Irwin* as well.[5] This "court will uphold [an agency's] findings, though of less than ideal clarity, if the agency's path may reasonably be discerned" so long as it is "satisfied that the agency has taken a hard look at the issues with the use of reasons and standards." *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 851 (D.C. Cir. 1970). This the Commission has done. Accordingly, we do not believe that

---

[4] Morris so stated in its second Waiver Request, asserting, *inter alia*, (1) a request for a one-year waiver "would allow [it] to utilize the financial resources that it was using for installment payments to build [an SMR network]"; (2) it "lack[ed] . . . appropriate equipment and . . . demand for 900 MHz SMR services in the vast majority of [its] predominantly rural markets simply ha[d] not occurred"; and (3) "[d]ue to the economic downturn, [it] has had reduced financial resources which have been exacerbated by its installment payments on its 900 MHz SMR licenses, which have not yet generated any revenue." *Morris Commc'ns, Inc.*, Petition for Rule Waiver at 6-7, 14 (Jan. 21, 2003).

[5] In addition, Morris's financial difficulties as well as its decision to stop post-default payments make Morris critically different from the *Irwin* licensee.

"'the agency's reasons are so insubstantial as to render [its waiver] denial an abuse of discretion.'" *BDPCS, Inc.*, 351 F.3d at 1181 (quoting *Mountain Solutions, Ltd.*, 197 F.3d at 517).[6]

*B. Equitable Estoppel*

Morris further contends that the FCC should be estopped from revoking its licenses because, by assuring Morris in the May 9, 2002 letter that the Commission would respond to its Waiver Request in thirty days, by accepting Morris's late installment payments and by expressly acknowledging that Morris had built and was operating two SMR stations (by processing Morris's Notifications of Buildout and by granting STAs for the stations), the Commission made a definite representation to Morris on which Morris reasonably relied to its harm. To apply equitable estoppel against the government, a party must show that (1) "there was a 'definite' representation to the party claiming estoppel," (2) the party "relied on its adversary's conduct in such a manner as to change his position

---

[6] Morris also argues that the FCC erred because it "offered no rational explanation, and no public interest justification, for refusing to grant Morris a waiver for the 'administrative error' that led to a brief, five day payment delay." Br. of Appellant at 13. In its order, however, the Commission noted that "the Division correctly explained that the payment of winning bids in compliance with the Commission's rules is critical to realizing the public interest objectives of Section 309(j) of the Communications Act" and "further explained that the Commission's rules presume that the entity that bids the most for a license in an auction is the entity that places the highest value on the use of the spectrum; that such entities are presumed to be those best able to put the licenses to their most efficient use for the benefit of the public; and that requiring licensees to demonstrate their ability to pay as a condition of continuing to hold licenses is essential to an efficient licensing process." 23 F.C.C.R. at 3194 ¶ 34.

for the worse," (3) the party's "reliance was reasonable" and (4) the government "engaged in affirmative misconduct." *Graham v. SEC*, 222 F.3d 994, 1007 (D.C. Cir. 2000) (internal quotations omitted); *LaRouche v. FEC*, 28 F.3d 137, 142 (D.C. Cir. 1994) (internal quotations omitted); *see also GAO v. Gen. Accounting Office Pers. Appeals Bd.*, 698 F.2d 516, 526 (D.C. Cir. 1983) ("Estoppel generally requires that government agents engage—by commission or omission—in conduct that can be characterized as misrepresentation or concealment, or, at least, behave in ways that have or will cause an egregiously unfair result.").

First, the May 9, 2002 letter made no representation one way or the other regarding Morris's Waiver Request but stated only that "[w]ithin 30 days of this letter we will mail you either a resolution . . . or a letter telling you when you can expect a resolution." Letter from Mark A. Reger, CFO, FCC to Frederick M. Joyce and Marianne Roach Casserly, Attorneys, Alston & Bird LLP (May 9, 2002). Nowhere did the Commission represent that, if it failed to respond within that period, Morris should deem the waiver granted. Second, the FCC's acceptance of Morris's post-default installment payments was not a "definite representation" that waiver was granted because Morris had been expressly warned in the April 26, 2002 default letter that "[a]ny amounts that were, or will be, tendered after the acceleration are being applied to the sums owing under the Loan Documents . . . [and the] acceptance by the Commission of any amounts comprising less than the entire debt shall not be deemed to be a cure of the Borrower's Default, a waiver of any other default under the Rules or Loan Documents, or a reinstatement by the Commission of the terms of the Loan Documents." Letter from Mark Reger, CFO, FCC, to Morris Communications, Inc. at 2 (Apr. 26, 2002). Finally, neither the FCC's receipt of Morris's Notifications of Buildout nor its

approval of the STAs constitutes a "definite" representation regarding Morris's Waiver Request. Moreover, while the Commission's three-year silence is egregious, it does not constitute "affirmative misconduct." Accordingly, Morris has not shown that equitable estoppel should be applied to the Commission.

## C. Morris's Remaining Arguments

Morris's remaining arguments are also without merit. Although the Commission failed to comply with 47 C.F.R. § 1.1911(e), requiring it to respond to "communications from [a] debtor[] within 30 days whenever feasible," its non-compliance does not affect its automatic cancellation authority. *See* 47 C.F.R. § 1.1902(f) ("Nothing in this subpart [(encompassing § 1.1911(e))] shall supercede [sic] or invalidate other Commission rules, such as the . . . general competitive bidding rules . . . or the service specific competitive bidding rules, as may be amended, regarding the Commission's rights, including but not limited to the Commission's *right to cancel a license or authorization*, obtain judgment, or collect interest, penalties, and administrative costs.") (emphasis added).[7]

---

[7] To the extent Morris argues that the Commission's processing of the Notifications of Buildout as well as the two STAs violated 47 C.F.R. § 1.1910(b)(2), which prohibits the Commission "from taking action on any application 'by any entity found to be delinquent in its debt to the Commission,'" Br. of Appellant at 14 (quoting 47 C.F.R. § 1.1910(b)(2)), the argument is waived because Morris failed to raise it before the Commission. *Qwest Corp. v. FCC*, 482 F.3d 471, 474 (D.C. Cir. 2007) ("'[This Court] generally lack[s] jurisdiction to review arguments that have not first been presented to the Commission.'") (citation omitted).

Morris's administrative due process argument—that is, the FCC failed to provide an "administrative hearing prior to any revocation of its authorizations to operate the two constructed SMR stations," Br. of Appellant at 24—incorrectly assumes that the Commission in fact authorized full operation of the SMR stations. It did not. Rather, it merely granted Morris special temporary authority while Morris's appeal was pending. As for Morris's contention that the Commission violated its right to administrative due process by automatically cancelling the nine SMR licenses, it is also without merit. The Communications Act of 1934 provides that "no . . . license shall be construed to create any right, beyond the terms, conditions, and periods of the license," 47 U.S.C. § 301, and Morris's licenses stated on their face that they were "conditioned upon the full and timely payment of all moneys due." *E.g. Morris Commc'ns, Inc.*, License KNNY352 at 7 (Oct. 16, 1996). Its licenses were thus contingent on Morris's timely payment of all amounts owing; once Morris failed to make the January 31, 2002 payments, the licenses themselves also lapsed. *See L.B. Wilson, Inc. v. FCC*, 170 F.2d 793, 798 (D.C. Cir. 1948) (license "right is limited in time and quality by the terms of the license").

For the foregoing reasons, we affirm the order of the Federal Communications Commission.

*So ordered.*