# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued September 20, 2013      Decided February 28, 2014

No. 12-1365

BLANCA TELEPHONE COMPANY, ET AL.,
PETITIONERS

v.

FEDERAL COMMUNICATIONS COMMISSION AND
UNITED STATES OF AMERICA,
RESPONDENTS

---

On Petition for Review of an Order of
the Federal Communications Commission

---

*Timothy E. Welch* argued the cause and filed the briefs for petitioners.

*Laurel R. Bergold*, Counsel, Federal Communications Commission, argued the cause for respondents. With her on the brief were *William J. Baer*, Assistant Attorney General, U.S. Department of Justice, *Robert B. Nicholson* and *James J. Fredricks*, Attorneys, *Sean A. Lev*, General Counsel, Federal Communications Commission, *Peter Karanjia*, Deputy General Counsel, and *Jacob M. Lewis*, Associate General Counsel.

Before: GARLAND, *Chief Judge*, and GINSBURG and SENTELLE, *Senior Circuit Judges*.

GARLAND, *Chief Judge*: In 2003, the Federal Communications Commission adopted regulations requiring digital wireless service providers to offer telephone handsets that are compatible with hearing aids. On the September 18, 2006 compliance deadline set by the agency, the three petitioners in this case joined some one hundred other small providers in asking the Commission to waive that deadline. Many of those carriers subsequently came into compliance by January 2007. The three petitioners did not.

In early 2008, the Commission responded to the waiver petitions as a group. Because compliant handsets were not widely available by September 2006, the Commission granted waivers with *nunc pro tunc* effect to many of the companies that had sought relief -- but not to the three petitioners. Following reconsideration in 2012, the Commission again denied waivers for the petitioners. Seeking review of that denial, the petitioners argue that the differential treatment was arbitrary and capricious. They also raise several challenges to the procedural regularity of the Commission's adjudication of their waiver petitions. We reject all of the petitioners' challenges and deny the petition for review.

I

In 1988, Congress enacted the Hearing Aid Compatibility Act to "ensure reasonable access to telephone service by persons with impaired hearing." 47 U.S.C. § 610(a). Because wireless telephones were not widely used in the late 1980s, Congress exempted them from the statute's requirement that all telephones meet technical standards for compatibility with hearing aids. *Id.* § 610(b)(2)(A). Presciently imagining a future in which cell phones would become more popular, however, Congress authorized the Federal Communications Commission

(FCC) to revoke or limit the exemption if "such revocation or limitation is in the public interest." *Id.* § 610(b)(2)(B)(i).

By 2003, the FCC was ready to make that call. In particular, the Commission determined that "wireless service has evolved to become increasingly more important to Americans' safety and quality of life" and that "the need for individuals with hearing disabilities to have access to wireless services has become critical." *In Re Section 68.4(a) of the Commission's Rules Governing Hearing Aid-Compatible Telephones*, 18 FCC Rcd. 16753, 16757, ¶ 7 (2003). Acting on that determination, the FCC issued regulations requiring digital wireless telephone manufacturers to make available to wireless service providers -- and requiring those providers to offer to customers -- hearing aid compatible handsets. *See id.* at 16754-55, ¶ 3.

Hearing aids function in one of two modes: acoustic coupling or telecoil coupling. In acoustic coupling mode, a hearing aid uses a microphone to amplify all nearby sounds. *Id.* at 16756, ¶ 5. Talking on a telephone can be difficult with a hearing aid in acoustic coupling mode because the microphone transmits unwanted background noise and can create distracting feedback. For some hearing aid users, telecoil coupling mode is the answer. Telecoil coupling mode switches off a hearing aid's microphone and amplifies only the audio from the person on the other end of the telephone, a process called inductive coupling. *Id.* ¶¶ 5-6. Before the FCC issued hearing aid compatibility rules for digital wireless telephones, it was difficult for the hearing impaired to find wireless telephones capable of inductive coupling. *Id.* ¶ 6.

That was all supposed to change by mid-2006. The FCC's 2003 regulations required digital wireless service providers to offer at least two handset models capable of inductive coupling by September 18, 2006. 47 C.F.R. § 20.19(d)(2) (2006). By the

time the deadline arrived, however, few providers had complied. Because telephone manufacturers were slow in developing compliant models and submitting them to the Commission for approval, compliant handsets did not trickle down to supplier inventory in time for many service providers to meet the deadline. *In Re Section 68.4(a) of the Commission's Rules Governing Hearing Aid-Compatible Telephones*, 23 FCC Rcd. 3352, 3357, ¶ 8, 3362, ¶ 16 (2008) [hereinafter *Order on Review*]. Smaller service providers like the petitioners here (described by the Commission as "Tier III" carriers) found it particularly difficult to achieve timely compliance. *Id.* at 3362, ¶ 16.

On the day of the September 2006 deadline, the three petitioners asked the FCC to waive that deadline. Many other carriers also did so at approximately the same time. *Order on Review*, 23 FCC Rcd. at 3355, ¶ 5 n.12. The FCC did not immediately act on those requests. By the close of 2006 the rollout delays limiting availability of the telephones had largely abated, and many carriers had come into compliance. *Id.* at 3362, ¶ 17.

The three petitioners failed to comply until several months into 2007. CTC Telecom, an Idaho service provider, began offering the required telephones on March 13, 2007. *Id.* at 3363, ¶ 19. CTC reported that it checked regularly with its supplier about compliant telephones and ordered them when the supplier began stocking the models. Farmers Cellular Telephone Company, an Alabama carrier, similarly reported that it often checked with its existing supplier and purchased compliant telephones when they became available. Farmers complied on June 6, 2007. *Id.* ¶ 20. Finally, Blanca Telephone Company of Colorado came into compliance on June 20, 2007. *Id.* ¶ 19.

By the time the FCC addressed the waiver requests in 2008, most carriers seeking waivers had come into compliance. Thus, the Commission had to decide whether to let bygones be bygones or, instead, to penalize some or all cases of tardiness. The FCC chose to penalize some. Applying its general discretionary waiver standard under 47 C.F.R. § 1.925(b), the FCC granted waivers with *nunc pro tunc* effect only to late-complying carriers that had exhibited "reasonable diligence" in their efforts to comply. *Order on Review*, 23 FCC Rcd. at 3362, ¶ 17.

The Commission relied upon two factors to gauge whether a carrier's efforts to comply were reasonably diligent. First, it looked to the date of compliance. Because many carriers had complied by January 1, 2007, the FCC concluded that compliance by that date was indicative of the time necessary "to resolve issues involved in identifying, testing, and ultimately selling inductive coupling-compliant handsets." *Id.* Second, the FCC examined carriers on a case-by-case basis to determine whether they had actually exhibited reasonable diligence. The FCC determined that a reasonably diligent carrier would, at the very least, have attempted to comply with the hearing aid compatibility rules. *See id.* at 3368-69, ¶ 34. And although merely relying upon existing vendors to supply compatible handsets may have been a reasonably diligent strategy at first, the Commission concluded that after many months of noncompliance, a reasonably diligent service provider would have begun to search for compliant telephones beyond its existing vendors. *Id.* at 3364-65, ¶ 22.

The upshot of the Commission's evaluation was that most of the providers to which it granted waivers had come into compliance by January 1, 2007. There were, however, a few exceptions. In one case, the FCC *denied* a waiver to a carrier that had complied by December 2006. *Id.* at 3368-69, ¶ 34.

Although the FCC regarded pre-January compliance as presumptively indicative of reasonable diligence, that carrier reported that the reason for its late compliance was simple "oversight" on its part. *Id.* For the FCC, that was not good enough. In another case, the FCC ultimately *granted* a waiver to a group of carriers (collectively known as the "i wireless" carriers) that did not comply until March 2007. Although the FCC originally denied a waiver to those carriers, upon reconsideration it determined that they had exhibited reasonable diligence in attempting to comply. In particular, the i wireless carriers had contacted a variety of vendors -- not just their current suppliers -- to find out when different compliant telephones would become available. In addition, the i wireless carriers partially attributed their late compliance to receiving inaccurate information about compatibility requirements from telephone manufacturers. *See In Re Section 68.4(a) of the Commission's Rules Governing Hearing Aid-Compatible Telephones*, 27 FCC Rcd. 9814, 9819-20, ¶¶ 12-13 (2012) [hereinafter *Reconsideration Order*].

In the FCC's view, the three petitioners here did not measure up to either of the benchmarks it established for evaluating reasonable diligence: They complied after January 1, 2007, and they did nothing to obtain compliant telephones beyond contacting their existing vendors. Accordingly, the Commission denied their waiver requests and referred their cases to the FCC's Enforcement Bureau. *Order on Review*, 23 FCC Rcd. at 3365, ¶ 22.

The petitioners filed a petition for reconsideration, contending that they were being treated unfairly because they were similarly situated to the carriers that had received waivers. They also raised challenges to the procedural regularity of the Commission's adjudication of their waiver petitions. After the

FCC denied their petition for reconsideration, the petitioners filed the petition for review that is now before us.

II

The petitioners' primary argument is that the FCC wrongly refused to waive liability for their tardy compliance. To succeed, the petitioners must show that the Commission's denial of their waivers was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). When evaluating an agency's interpretation and application of a general, discretionary waiver standard, "[o]ur review . . . is extremely limited." *BDPCS, Inc. v. FCC*, 351 F.3d 1177, 1181 (D.C. Cir. 2003). We will vacate the denial of a waiver "only when the agency's reasons are so insubstantial as to render that denial an abuse of discretion." *Id.* (internal quotation marks omitted). Among other things, an agency "abuses its discretion if it fails to provide adequate explanation before it treats similarly situated parties differently." *Morris Commc'ns, Inc. v. FCC*, 566 F.3d 184, 188 (D.C. Cir. 2009) (internal quotation marks omitted).

A

Under its longstanding waiver regulations, which are not challenged in this case, the FCC may grant a request to waive a rule if: "(i) [t]he underlying purpose of the rule[] would not be served . . . by application to the instant case, and . . . a grant . . . would be in the public interest; or (ii) [i]n view of unique or unusual factual circumstances . . . , application of the rule would be inequitable, unduly burdensome or contrary to the public interest." 47 C.F.R. § 1.925(b)(3). Because compliant telephones were not widely available by the September 2006 compliance date, the Commission reasonably concluded that the fairness concerns underlying its discretionary waiver standard

would be served by granting "some relief" to a small carrier "exercising reasonable diligence." *Order on Review*, 23 FCC Rcd. at 3362, ¶¶ 16-17.

But the Commission's determination of what it took to show "reasonable diligence" was also reasonable. First, the Commission decided to look at the date the carrier came into compliance for an inference as to whether it had been reasonably diligent. Many providers had complied by January 1, 2007, which meant that compliant telephones had made their way to some suppliers' warehouses and had been tested and readied for sale by that date. *Id.* Because the severity of the initial availability shortfall had subsided by January 1, that date was an acceptable choice for roughly measuring whether a particular carrier's efforts at compliance reflected reasonable diligence.

The petitioners complain that they had no notice that January 1 would play an important role in the FCC's analysis. But that complaint is unpersuasive. The petitioners did have notice of both the original September 2006 deadline and the provisions of the FCC's general waiver standard. A party that files for waiver on the day of a deadline will never know in advance how much leeway, if any, an agency will retrospectively grant.

Second, the FCC examined the carrier's actual efforts to comply. "Carriers that did not achieve compliance by [January 1, 2007] were not automatically precluded from relief or subject to higher burdens of proof; rather, the Commission was not able to rely on the time of compliance to support" an inference of reasonable diligence. *Reconsideration Order*, 27 FCC Rcd. at 9822, ¶ 19. In the FCC's view, the most crucial factor in assessing whether a carrier that complied after January 1 was reasonably diligent was whether the carrier confined its search for compliant telephones to its existing suppliers or, instead,

sought information from other vendors. *See Order on Review*, 23 FCC Rcd. at 3365, ¶ 22. One's existing suppliers are quite naturally the first place to look for compliant telephones, and contacting them alone may have been reasonable for a time. But it was not arbitrary or capricious for the FCC to determine that, after many months of noncompliance, it was no longer "sufficient . . . simply to contact one's existing vendors." *Id.*

Because the three petitioners did not comply until after January 1, 2007, and because they reported to the Commission that they had done nothing to seek out compliant telephones beyond contacting their existing suppliers, the petitioners failed to satisfy either of the FCC's reasonable criteria for waiver. Accordingly, the FCC's decision to deny the waiver petitions would appear to be reasonable as well.

B

But that is not the end of the analysis. However reasonable the denial of the petitioners' waivers was on its own terms, the Commission also had an obligation not to treat similarly situated carriers differently without offering an adequate explanation. *See Morris Commc'ns, Inc.*, 566 F.3d at 188. The petitioners contend that the FCC failed to satisfy this obligation in three respects.[1]

---

[1]This obligation is inferred from the Administrative Procedure Act's direction that reviewing courts shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706; *see Morris Commc'ns, Inc.*, 566 F.3d at 188. Although the petitioners' Statement of Issues suggests that their allegedly differential treatment also implicates their "5th Amendment right to due process," Pet'rs' Br. at xviii, their brief's argument rests entirely on their asserted "administrative due process right[]" to receive the same treatment as similarly situated carriers, *id.*

First, the petitioners insist that they were similarly situated to those waiver recipients that came into compliance by January 1, 2007. Pet'rs' Br. 27-29. That contention is incorrect on its face because the petitioners did not comply by January 1. And as we have discussed above, in light of the fact that many carriers were able to do so, it was not unreasonable for the Commission to select January 1 as a presumptive indicator of reasonable diligence.

Nor were the petitioners similarly situated with respect to their actual diligence. As we have also explained, the Commission viewed "reasonable diligence" as contacting one's existing suppliers for a limited period of time, but not indefinitely. Thus, the carriers that complied within a few months of the original deadline were reasonably diligent so long as they sought compliant telephones from existing suppliers. But by January 2007, so much time had passed since the original deadline that the Commission regarded it as unreasonable for carriers not to redouble their efforts to seek compliant telephones from other sources. And that is the category into which the petitioners fell.

Second, the petitioners contend that the FCC failed to distinguish the denial of their waivers from its grant of a waiver to i wireless, a group of carriers that did not come into compliance until March 2007. Pet'rs' Br. 30-31. Again, that is not correct. Initially, the FCC rejected waiver petitions from both the petitioners and i wireless. *Order on Review*, 23 FCC Rcd. at 3372, ¶ 44. But at the reconsideration stage, the i wireless carriers persuaded the Commission that, although they failed to comply until March 2007, they had been reasonably diligent by reaching out beyond their existing suppliers. Specifically, the Commission found that the i wireless carriers

---

at 14, 37.

"identif[ied] the authorized distributors for particular manufacturers [and] obtain[ed] information regarding handset availability from these distributors." *Reconsideration Order*, 27 FCC Rcd. at 9819, ¶ 12. The petitioners, by contrast, did not look past their existing suppliers.

Third, the petitioners contrast the denial of their waivers with the FCC's 2007 decision to grant a group of carriers a waiver from a different set of hearing aid compatibility rules. Pet'rs' Br. 33-36. Even assuming that the context of those waivers was comparable,[2] the FCC reasonably distinguished the denial of the petitioners' waiver requests. The 2007 waiver recipients received misinformation from vendors assuring them that they were *in compliance* with FCC requirements. *See In Re Section 68.4(a) of the Commission's Rules Governing Hearing Aid-Compatible Telephones*, 22 FCC Rcd. 20459, 20472-73, ¶ 30 (2007). Although the petitioners here claim that they also received inaccurate reports from their vendors, the nature of the misinformation was different. The petitioners contend that their vendors wrongly advised them that compliant telephones remained unavailable. By contrast to the 2007 waiver recipients, however, the petitioners do not dispute that they knew they were *not in compliance* with the rules' requirements. *Reconsideration Order*, 27 FCC Rcd. at 9823, ¶ 21. The FCC was not unreasonable in concluding that the two kinds of misinformation were sufficiently different to warrant different treatment.

---

[2]The 2007 waiver involved requirements for telephones compatible with hearing aids in acoustic coupling mode (unlike the petitioners' request for a waiver from the rules for telecoil coupling). The Commission had previously waived one aspect of the acoustic requirements, but when that waiver lapsed, some carriers failed to comply with the rules, in part because their vendors wrongly assured them they were in compliance.

III

The petitioners raise several additional challenges to the denial of their waiver requests.  We address each in turn.

First, the petitioners contend that, when the FCC announced the factors that it would consider in adjudicating waivers of its compliance deadline, the Commission effectively adopted a new "rule" that the Administrative Procedure Act (APA) required it to promulgate through notice-and-comment rulemaking. Pet'rs' Br. 20 (citing 5 U.S.C. § 553).   But this court has previously rejected virtually the identical contention.   In *Mountain Solutions, Ltd. v. FCC*, we said that, "even if the Commission had not previously articulated the policy rationale that formed the primary basis for granting or denying the waiver requests, the Commission's exercise of its wide discretion in denying Mountain Solutions' waiver request . . . was in the nature of an adjudicatory decision rather than the announcement of a new rule."  197 F.3d 512, 519 n.12 (D.C. Cir. 1999).  And as we have repeatedly held, adjudicatory decisions are not subject to the APA's notice-and-comment requirements.  *See, e.g.*, *Cassell v. FCC*, 154 F.3d 478, 485-86 (D.C. Cir. 1998).

Second, the petitioners maintain that the Commission improperly considered an opposition to the waiver petitions that was filed in contravention of FCC rules against ex parte and untimely filings.  Pet'rs' Br. 45.  Although upon reconsideration the Commission acknowledged that the filing violated its rules regarding ex parte submissions, it rightly concluded that the violation did not prejudice the petitioners. *See Reconsideration Order*, 27 FCC Rcd. at 9824-25, ¶¶ 23-26.   At the reconsideration stage, the petitioners were able to -- and did -- fully contest the arguments that were advanced in the ex parte filing.   And there is no indication that the Commission's reconsideration was tainted by its initial consideration of the

filing. The violation of the rules was therefore harmless. *See* 5 U.S.C. § 706(2)(F) (providing that the reviewing court shall take "due account . . . of the rule of prejudicial error"); *Lichoulas v. FERC*, 606 F.3d 769, 778 (D.C. Cir. 2010) (holding that a court will not undo the action of an agency that received an ex parte communication "unless the agency's decisionmaking process was irrevocably tainted so as to make the ultimate judgment of the agency unfair" (internal quotation marks omitted)).

Finally, the petitioners contend that the FCC violated the Paperwork Reduction Act (PRA), 44 U.S.C. § 3512(a), by suggesting that petitioner CTC should have supported a document it submitted by attaching a sworn declaration of the document's authenticity. The PRA bars an agency from subjecting a person "to any penalty for failing to comply with a collection of information," unless the agency first submits the collection requirement to review by the Office of Management and Budget. *Id.* Although we doubt that requiring that waiver requests be accompanied by sworn declarations constitutes a "collection of information" under the PRA, it would not matter if it did. The FCC did not subject CTC "to any penalty" for failing to provide a sworn declaration. Instead, the Commission "note[d] that CTC did not provide a sworn declaration[,] . . . but *in any case*" evaluated the document and dismissed its relevance for other reasons. *Reconsideration Order*, 27 FCC Rcd. at 9823-24, ¶ 22 (emphasis added). Accordingly, this challenge to the denial of the petitioners' waiver requests suffers the same fate as each of the others.

IV

For the foregoing reasons, the petition for review is

*Denied.*